Piedmont Venture Partners, L.P. and Piedmont Venture Partners II, L.P. by and through William E. Ray, Liquidator v. Deloitte & Touche, L.L.P., 2007 NCBC 6

NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 10418

PIEDMONT VENTURE PARTNERS, L.P.
and PIEDMONT VENTURE PARTNERS II,
L.P., by and through WILLIAM E. RAY,
Liquidator,

Plaintiffs,

v.

DELOITTE & TOUCHE, L.L.P., a North
Carolina Limited Liability Partnership;
DELOITTE & TOUCHE USA, L.L.P., a North
Carolina Limited Liability Partnership,

Defendants.

**ORDER**

*Maynard, Cooper & Gale, P.C. by Walker P. Badham, III, Brannon J. Buck, Will A. Smith, and Robert W. Tapscott, Jr.; The Jackson Law Group by Kurt F. Hausler and Gary W. Jackson; and The Law Office of Arcangela M. Mazzariello by Arcangela M. Mazzariello for Plaintiffs Piedmont Venture Partners, L.P. and Piedmont Venture Partners II, L.P., by and through, William E. Ray, Liquidator.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. by John S. Buford, Jim W. Phillips, Jr., and Jennifer K. Van Zant for Defendants Deloitte & Touche, L.L.P. and Deloitte & Touche USA, L.L.P.*

Diaz, Judge.

{1}     The Court heard this matter on 13 November 2006 on the Defendants' Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure ("Rule 12(b)(1)").

{2}     This case is before the Court a second time.  On 21 April 2006, the Court dismissed, without prejudice, a derivative action brought by William E. Ray ("Ray") and two other limited

partners of Piedmont Venture Partners, L.P. and Piedmont Venture Partners II, L.P. (collectively, the "Funds") because of their failure to exhaust the "intracorporate" remedies available to them under the Funds' partnership agreements and their failure to make demand on the proper partnership representative or otherwise explain why such a demand was impractical. *Ray v. Deloitte & Touche, L.L.P.*, 2006 NCBC 5 (N.C. Super. Apr. 21, 2006).

{3}    In this action, Ray purports to be acting in his capacity as "Liquidator" of the now essentially insolvent Funds, alleging in the Amended Complaint that he was elected to this position by the Funds' limited partners for the sole purpose of pursuing litigation against the Defendants. (Am. Compl. ¶¶ 4, 15.)

{4}    Defendants dispute the legitimacy of the process leading to Ray's election as liquidator, alleging that Ray failed to give sufficient notice of the election as to one of the Funds and that he did not obtain a proper majority of the votes cast as to both Funds. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss 7-8.) Defendants also take issue with Ray's attempt to limit his role to that of special prosecutor of the claims in this action. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss 16.)

{5}    For reasons I explain below, I am not convinced that the Defendants' "process" arguments regarding Ray's election find traction in the applicable partnership agreements or state law. The question of Ray's standing is not so easily resolved, however, given the case's "perfect storm" of peculiar facts and scant relevant law.

{6}    The Court has Ray's view of the matter in the form of the allegations in the Amended Complaint. But, as the Defendants correctly note, Ray has attempted to carve out a narrow role for himself here, effectively disavowing any responsibility for winding up the affairs of the Funds

2

within this State. That position is inconsistent with the broad powers and duties properly vested in a liquidator of an insolvent entity.

{7} On the other hand, if I granted the Defendants' Motion to Dismiss it would mean only that Ray would be barred from pursuing the claims as the Funds' representative. That result, however, begs the questions of whether the Funds have viable claims against the Defendants and, if so, how best to prosecute them.

{8} For reasons I explain below, the Court **DENIES** the Defendants' Motion to Dismiss the Amended Complaint. In the exercise of its equitable powers, the Court will appoint a receiver for the Funds, who will, among other things, (a) consider the merits of the claims asserted in this case and determine whether to pursue them, and (b) wind down the activities of the Funds within this State.

## I.

### PROCEDURAL BACKGROUND

{9} On 29 August 2005, Ray and two other limited partners filed the first Complaint, which they styled as a Verified Derivative Complaint ("Complaint I"). The case was transferred to the North Carolina Business Court and assigned to me as a complex business matter by order of the Chief Justice of the North Carolina Supreme Court dated 1 December 2005.

{10} Complaint I asserted claims against the Defendants for (a) breach of contract – third-party beneficiary, (b) negligence/wantonness, (c) breach of fiduciary duty, (d) suppression/concealment, (e) professional malpractice, (f) fraud, and (g) violations of §§ 551, 552 of the Restatement of Torts. (Compl. I ¶¶ 42-89.)

3

{11}    Defendants moved to dismiss Complaint I on 1 December 2005, alleging, among other things, that the plaintiffs failed to make a pre-suit demand on the proper representatives of the Funds.

{12}    On 21 April 2006, the Court entered an Order granting the motion to dismiss without prejudice to the plaintiffs' right to correct the defects in their pleading with respect to the demand requirement. *Ray v. Deloitte & Touche, L.L.P.*, 2006 NCBC 5 (N.C. Super. Apr. 21, 2006).

{13}    On 24 May 2006, the Court granted Ray and his two co-plaintiffs one year from the date of entry of the 21 April 2006 Order to re-file their action.

{14}    The day before entry of the Court's 24 May 2006 Order, however, Ray and his two co-plaintiffs filed a new Complaint ("Complaint II"), which, like its predecessor, was also styled a derivative action. In Complaint II, Ray explained that he was in the process of seeking election to serve as liquidator of the Funds. (Compl. II ¶¶ 30-43.)

{15}    Ray subsequently amended Complaint II (hereinafter, the "Amended Complaint") to reflect that it was now a direct action, brought by him, following his election as liquidator.

{16}    The Amended Complaint alleges claims against the Defendants for (a) breach of contract, (b) negligence, (c) gross negligence/willful and wanton conduct, (d) breach of fiduciary duty, (e) suppression/concealment, (f) professional malpractice, (g) fraud, and (h) violations of §§ 551, 552 of the Restatement of Torts. (Am. Compl. ¶¶ 66-126.)

{17}    On 28 September 2006, the Defendants filed a motion and supporting brief seeking to dismiss the Amended Complaint pursuant to Rule 12(b)(1) (the "Motion"). On 18 October 2006, Ray filed his brief in opposition. On 27 October 2006, the Defendants filed their reply.

{18}    The Court heard oral arguments on the Motion on 13 November 2006.

4

{19}    On 16 November 2006, Ray moved to supplement his brief in opposition to the Motion. The Court accepted Ray's supplement on 21 November 2006, and the Defendants filed a response to the supplement on 1 December 2006.

## II.

## THE FACTS

### A.

### THE PARTIES

{20}    Ray is a limited partner in the Funds.  (Compl. II ¶ 2.)

{21}    Plaintiff Piedmont Venture Partners, L.P. ("Fund I") is a North Carolina limited partnership organized on 30 December 1996 and operated pursuant to the Fund I Partnership Agreement.  (Am. Compl. ¶¶ 1, 44; Mot. to Dismiss Am. Compl. Ex. J.)

{22}    Plaintiff Piedmont Venture Partners II, L.P. ("Fund II") is a Delaware limited partnership organized on 16 November 1998 and operated pursuant to the Fund II Partnership Agreement. (Am. Compl. ¶¶ 2, 44; Mot. to Dismiss Am. Compl. Ex. K.)  The Court will refer to the Fund I Partnership Agreement and the Fund II Partnership Agreement collectively as the "Partnership Agreements."

{23}    The Funds were organized for the purpose of making venture capital investments.  (Am. Compl. ¶ 43; Mot. to Dismiss Am. Compl. Exs. J, K.)

{24}    Piedmont Venture Management, Inc. ("PVM") served as fund manager and general partner for Fund I, and as fund manager for Fund II.  (Am. Compl. ¶ 8.)  Piedmont Venture Capital Management, L.L.C. ("PVCM") served as general partner for Fund II.  (Am. Compl. ¶ 9.)  The Court will refer to PVM and PVCM collectively as the "General Partners."

{25}    Stacy E. Anderson ("Anderson") and William W. Neal ("Neal") were, at all relevant times, the managing principals of the General Partners.  (Am. Compl. ¶¶ 10-11.)

{26}    Defendants Deloitte & Touche, L.L.P and Deloitte & Touche USA, L.L.P. (collectively "Deloitte") are limited liability partnerships organized and existing under the laws of the state of North Carolina.  (Am. Compl. ¶¶ 5-6.)

{27}    Deloitte served as independent auditor for the Funds from 1999 until 2001, when it allegedly withdrew from the annual audit.  (Am. Compl. ¶¶ 7, 56-57.)

**B.**

**THE CLAIMS**

{28}    The Funds, through Ray as their liquidator, seek damages from Deloitte for its alleged acts or omissions while serving as independent auditor for the Funds.  (*See* Am. Compl. ¶¶ 66-126.) Generally stated, Plaintiffs allege that "Deloitte failed to communicate to the Funds and/or Limited Partners, among other things, the widespread fraud, willful misconduct, and acts of self-dealing being committed by the General Partner[s], despite being on notice of and/or having actual knowledge of the same."  (Am. Compl. ¶ 14.)

{29}    Ray, along with approximately 162 other individual and institutional investors (hereinafter, the "Limited Partners"), invested a total of more than $45,000,000 in the Funds.  (Am. Compl. ¶¶ 45-47.)

{30}    Plaintiffs allege that the Partnership Agreements required the General Partners to provide audited financial statements to the Limited Partners on an annual basis and that the audits represented "the only objective information by which the Limited Partners [could] assess the Funds' profitability and the profitability of their respective investments, as well as ensuring that the

6

General Partner[s] acted in accordance with the Partnership Agreements and applicable law." (Am. Compl. ¶ 48.)

{31}   Plaintiffs allege that the General Partners retained Deloitte to prepare the audited financial statements. (Am. Compl. ¶ 48.) Plaintiffs further allege that Deloitte performed the auditing services for the years 1999 and 2000, but withdrew from the engagement before completing the 2001 audit. (Am. Compl. ¶¶ 54, 56.)

{32}   According to the Plaintiffs, Deloitte withdrew from the 2001 audit with knowledge of "the General Partners' fraud and misconduct and the devastating impact that it was having on the financial status of the Funds." (Am. Compl. ¶ 56.)

{33}   Plaintiffs also allege that "Deloitte . . . discovered . . . information indicating that the representations in and the assumptions underlying the Funds' 1999 and 2000 financial statements were erroneous. Despite this knowledge, Deloitte never revised, corrected or modified the representations made in these financial statements."[1] (Am. Compl. ¶ 60.)

{34}   As a result, the Funds' investment capital, according to the Plaintiffs, has been reduced from $45,000,000 to almost nothing. (Am. Compl. ¶ 53.)

## C.

### THE STATUS OF THE GENERAL PARTNERS

{35}   On 27 May 2005, the General Partners filed Chapter 7 petitions for bankruptcy in the U.S. Bankruptcy Court for the Western District of North Carolina.[2] (Am. Compl. ¶ 18.)

---

[1] Plaintiffs allege that Deloitte became aware of the General Partners' malfeasance and the errors in the 1999 and 2000 financial statements, at the latest, in 2002 during its audit of the Funds' 2001 financial statements. (Am. Compl. ¶¶ 57, 60.)

[2] The plaintiffs in Complaint I also filed suit against Neal and Anderson in bankruptcy court. Following my 21 April 2006 Order as to Complaint I, the bankruptcy court dismissed the claims against Neal and Anderson without prejudice. *In Re Piedmont Venture Management, Inc.,* Case No. 05-32242 (Adv. Proc. No. 05-03517) (Bankr. W.D.N.C. May 19, 2006).

{36}　The Partnership Agreements explain what is to occur in the event of a general partner filing for bankruptcy.  Section 5.2 of the Fund I Agreement states that if the general partner becomes bankrupt, "its successor shall be chosen as set forth in Section 10.1(a)(iv)."  (Mot. to Dismiss Am. Compl. Ex. J § 5.2.)  Under Section 10.1(a)(iv), a two-thirds majority of the limited partners have 90 days to agree to continue Fund I and elect a new general partner.  (Mot. to Dismiss Am. Compl. Ex. J § 10.1(a)(iv).)  If the limited partners choose not to elect a new general partner, they may instead elect a liquidator to dissolve and wind up the affairs of Fund I.  (Mot. to Dismiss Am. Compl. Ex. J. § 10.1(c).)

{37}　The Fund II Agreement establishes a similar procedure.  Specifically, Section 14.2 provides that "[t]he Partnership shall be dissolved" upon the bankruptcy of a general partner.  (Mot. to Dismiss Am. Compl. Ex. K § 14.2; Del. Code Ann. tit. 6, § 17-402(a) (2006).)  In the event that there is no general partner at dissolution (as was the case here), "a Limited Partner Majority may designate one or more persons to act as the Liquidator" to wind up Fund II's affairs.  (Mot. to Dismiss Am. Compl. Ex. K § 14.5.)  Section 14.5 of the Agreement provides further that "[a]ny such Liquidator which is not the General Partner shall be a 'liquidating trustee' within the meaning of [Del. Code Ann. tit. 6 §] 17-101(9)."  (Mot. to Dismiss Am. Compl. Ex. K § 14.5.)

{38}　North Carolina and Delaware law also address the effect of a general partner's bankruptcy on a limited partnership.  The respective statutes provide that the bankruptcy of a general partner results in the dissolution and commencement of the winding up of a limited partnership's affairs.  *See* N.C.G.S. §§ 59-402, 59-801, 59-803 (2006); Del. Code Ann. tit. 6, §§ 17-101(10), 17-402, 17-801, 17-803 (2006).  The Delaware Uniform Limited Partnership Act provides specifically that the limited partners may appoint a liquidator to wind up the limited

8

partnership's affairs. Del. Code Ann. tit. 6, §§ 17-101(10), 17-402, 17-803 (2006). The North Carolina Uniform Limited Partnership Act does not provide specifically for the appointment of a liquidator, but instead leaves the winding up process to "the general partners who have not wrongfully dissolved a limited partnership or, if none, the limited partners[.]" N.C.G.S. § 59-803 (2006).

{39} Thus, under the Partnership Agreements and applicable state law, the General Partners were removed from office when they filed for bankruptcy on 27 May 2005, and because no substitute general partner was appointed for either of the Funds and the Limited Partners made no attempt to continue the Funds' operations, the Funds are in dissolution.

## D.

## RAY'S ELECTION AS LIQUIDATOR

{40} As noted earlier, the Court dismissed Complaint I on 21 April 2006 because of the plaintiffs' failure to exhaust the "intracorporate" remedies available to them under the Partnership Agreements and to make demand on the proper partnership representative or otherwise explain why such a demand was impractical. *Ray v. Deloitte & Touche, L.L.P.*, 2006 NCBC 5 (N.C. Super. Apr. 21, 2006).

{41} To remedy these deficiencies, Ray sought election as liquidator of the Funds. (Am. Compl. ¶ 28.)

{42} To that end, Ray wrote to the Limited Partners on 5 May 2006 to propose a special meeting. (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss Ex. C.) Ray's letter stated that the purpose of the special meeting would be to elect a liquidator with authority to prosecute the lawsuits against Deloitte and the General Partners. (Pls.' Resp. in Opp'n to Defs.' Mot. to

9

Dismiss Ex. C.)  Ray's letter also advised the Limited Partners as follows regarding the limits of his undertaking:

> The undersigned proposes the appointment of William E. Ray as Liquidator of two of the Funds' assets, described below.  If elected, Mr. Ray would, among other things, determine whether it is in the best interests of the Funds to pursue two separate lawsuits arising out of the loss of the Funds' investment capital . . . Mr. Ray, if elected, will determine whether to prosecute the above-referenced lawsuits . . . **This proposal shall not be construed as seeking the election of Mr. Ray to serve in the capacity of Liquidator for any assets other than those related to the lawsuits against Deloitte and the Managing Principals.  For purposes of clarification, to the extent other assets of the Funds exist and are subject to liquidation, the undersigned does not contemplate or propose that Mr. Ray should liquidate such assets.**

(Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss Ex. C Attach. 2 (emphasis added).)

{43}   The Fund I Partnership Agreement provides that notice of a partners' meeting shall be given "not less than ten (10) business days nor more than sixty (60) days prior to the date of such meeting."[3]  (Mot. to Dismiss Am. Compl. Ex. J § 7.6(d).)

{44}   The special meeting convened on 17 May 2006, eight business days after notice was provided, but was recessed for lack of a quorum.  (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss Ex. D.)

{45}   The meeting reconvened on 27 July 2006.  (Ray Aff. ¶ 18, Oct. 18, 2006.)  Ray alleges that 51.42% of Fund I's limited partner interests and 53.49% of Fund II's limited partner interests voted to appoint him liquidator at this meeting.  (Ray Aff. ¶¶ 15-16, Oct. 18, 2006.)

{46}   The votes cast for Ray's election included limited partner interests owned in both Funds by East Boulevard Limited Partnership ("East Boulevard").  (Ray. Aff. ¶¶ 15-16, Oct. 18, 2006.)  East Boulevard's general partner is an entity named Nuray Holdings.  (Ray. Aff. ¶

---

[3] The Fund II Partnership Agreement has no explicit notice requirements.  (*See* Mot. to Dismiss Am. Compl. Ex. K.)

3, Oct. 18, 2006.) Ray is the manager and owner of Nuray Holdings. (Ray Aff. ¶ 3, Oct. 18, 2006.)

{47} From September through December 2005, while Complaint I was pending in this Court, and after the automatic removal of the General Partners following their bankruptcy filing, East Boulevard executed a series of purchase and sale agreements whereby it increased its limited partner interest in Fund I from 2.66% to 15.83% of the total ownership interests. (Ray Aff. ¶¶ 5-11, Oct. 18, 2006.) Similarly, East Boulevard increased its limited partner interest in Fund II from 2.88% to 14.42% of the total ownership interests. (Ray Aff. ¶¶ 5-11, Oct. 18, 2006.)

{48} The Partnership Agreements require that all transfers of interest, in particular voting interests, be approved by that Fund's general partner. (*See* Mot. to Dismiss Am. Compl. Ex. J §§ 8.1(b), 8.4(a), 8.5, Ex. K §§ 11.1-11.4.) Because the General Partners had been removed, however, East Boulevard instead sought and received the approval of the bankruptcy trustee for these transfers. (Ray Aff. ¶¶ 5-11, Oct. 18, 2006.)

{49} If the East Boulevard block of votes garnered by Ray for each fund is excluded from the total vote tally in favor of appointing Ray as liquidator, Ray did not receive the requisite majority of the votes cast. (*See* Ray Aff. ¶¶ 5-11, 15-16, Oct. 18, 2006.)

### III.

### CONCLUSIONS OF LAW

### A.

### MOTION TO DISMISS UNDER RULE 12(b)(1)

{50} Pursuant to Rule 12(b)(1), the Defendants question Ray's standing to pursue this lawsuit on behalf of the Funds. "Standing refers to whether a party has a sufficient stake in an otherwise

justiciable controversy such that he or she may properly seek adjudication of the matter." *Am. Woodland Indus., Inc. v. Tolson*, 155 N.C. App. 624, 626, 574 S.E.2d 55, 57 (2002). Standing is a question of subject matter jurisdiction, which is a prerequisite to the exercise of any authority by the state courts. *Street v. Smart Corp.*, 157 N.C. App. 303, 305, 578 S.E.2d 695, 698 (2003); *Harris v. Pembaur*, 84 N.C. App. 666, 667, 353 S.E.2d 673, 675 (1987).

{51} In considering a motion to dismiss for lack of subject matter jurisdiction, the court may consider and weigh matters outside of the pleadings. *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978).

## B.

## ANALYSIS

{52} Defendants take issue with the process leading up to Ray's election as liquidator, arguing that Ray failed to give sufficient notice of the meeting resulting in his election and did not receive a proper majority of the votes cast by the Limited Partners.

{53} With respect to this latter issue, Defendants assert that East Boulevard's purported purchase of additional limited partner interests was invalid (and, therefore, the corresponding votes cast void) because the transactions were not approved by the General Partners, as required by the terms of the Partnership Agreements. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss 7-8.) As a result, Defendants contend, Ray lacks standing to bring this lawsuit as the representative of the Funds.

{54} Defendants argue further that Ray may not circumscribe his duties as liquidator and, in particular, may not limit his service to that of "the self-appointed sheriff of the Funds." (Defs.' Mem. of Law in Supp. of Mot. to Dismiss 16.)

{55} Ray responds first that the Funds, as named plaintiffs, clearly have standing to pursue this litigation and that any inquiry by the Court starts and ends there. (Pls.' Resp. in Opp'n to Defs.'

12

Mot. to Dismiss 7-9.) According to Ray, it is the Defendants who lack standing to challenge his election as liquidator, (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss 9-14), and, in any event, Ray did garner the requisite majority vote required for the post, (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss 15-19).

{56}  As for his limited duties, Ray asserts that the Funds contemplate the selection of "multiple persons to carry out the liquidation of the Fund(s)" and "do not limit the roles of and duties of an elected Liquidator." (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss 20.)

{57}  Finally, Ray contends that the failure of any limited partner to object to the election process or to his performance as liquidator has effectively worked a "ratification" of his authority to serve as liquidator. (Pls.' Supplement to Resp. to Defs.' Mot. to Dismiss 2-4.)

{58}  The Court does not intend to address all of these arguments. Suffice it to say, however, that Ray's crabbed view of the scope of the standing question is incorrect. A business entity, whatever its legal form, may act only through its duly authorized representatives. *See, e.g., Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 112, 105 S.E.2d 428, 430 (1958) ("A corporation can only act through its agents, and must be responsible for their acts."); *The Greater N.Y. Sav. Bank v. Sky-Drummond Assocs., L.P.*, No. 90L-10-3-1-MT, 1991 Del. Super. LEXIS 103, at *7 (Del. Super. Ct. Mar. 15, 1991) ("It is well known that a limited partnership . . . can act only through its officer or agent.").

{59}  Thus, standing in the context of a business entity means not only that the Court has before it the proper party plaintiff, but that the claim is being prosecuted by those with authority to act for that plaintiff. In most cases, this is a non-issue, but where, as here, the facts raise a question as to a party's standing, the Court may not ignore it.

13

{60} That said, it does not appear to me that Ray's election was procedurally flawed, at least with respect to the questions of notice and the legitimacy of the votes cast in his favor. As to the former, Ray notes correctly that only the Fund I Partnership Agreement requires a ten-day notice period before a special meeting may be convened. (Mot. to Dismiss A. Compl. Ex. J § 7.6(d).)

{61} Regardless, that Ray may not have provided sufficient notice pursuant to that provision is, in the Court's view, irrelevant where no limited partner has objected to the shortened notice. *Compare* N.C.G.S. § 55-7-06(b)(1) (2006) ("A shareholder's attendance at a meeting . . . [w]aives objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting."), *with* Del. Code Ann. tit. 8, § 229 (2006) ("Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened."), *and Koch v. Stearn*, No. 12,515, 1992 Del. Ch. LEXIS 163, at *12 n.1 (Del. Ch. July 28, 1992) (finding ten-day notice requirement waived by shareholder's attendance at the meeting and failure to object to lack of notice).

{62} I also agree with Ray that "the requirement for General Partner approval of partnership transfers is . . . designed to protect the Funds from *outside* entities seeking an interest in the partnership." (Pls.' Opp'n to Defs.' Mot. to Dismiss 16.) *See generally In re Schick,* 235 B.R. 318, 324 (Bankr. S.D.N.Y. 1999) ("'At the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated.'" (quoting *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 363 N.E.2d 573, 577 (1977))). Here, East Boulevard was already a limited partner of both Funds and, as a result, it is difficult to see how East Boulevard's acquisition of

14

additional voting interests in the Funds would have been objectionable to the General Partners who, as Ray points out, could no longer give their approval anyway.[4]

{63}  Process aside, however, the substantive problem with Ray's election as liquidator is that he is unwilling to accept the full mantle of responsibilities that attend to the post.  Liquidation is a process for the winding up of a dissolved partnership's affairs by collecting and providing for an orderly distribution of **all** of the partnership's assets, first to creditors, if any, and then to the partners.  *See generally* N.C.G.S. §§ 59-803 to -804 (2006); Del. Code Ann. tit. 6, §§ 17-803 to -804 (2006).

{64}  In the Court's view, one who seeks to serve as a liquidator may not pick and choose among the assets of the partnership that he will supervise, but instead must be willing to accept responsibility for the full and complete winding up of the partnership's affairs within this State.

{65}  Ray argues, however, that the Partnership Agreements "do not require the Liquidator to take on specific responsibilities;" "place no certain requirements on the roles of a liquidator chosen by the Limited Partners;" and "do not preclude the Limited Partners from electing more than one Liquidator[.]"  (Pls.' Opp'n to Defs.' Mot. to Dismiss 20.)  Ray also asserts that, as a practical matter, he has accepted responsibility for the most valuable assets that the Funds have by agreeing to pursue the Funds' litigation claims.

{66}  I agree with Ray in part.  That is, Ray is absolutely correct that the Partnership Agreements do not preclude the appointment of more than one person or entity to serve as a liquidator.  Additionally, it may well be, as Ray asserts, that the Funds' litigation claims are their most valuable assets.  But, what Ray ignores is that the proper winding up of the Funds' interests in this state involves more than litigation and that, at present, there is no one designated to undertake this larger

---

[4] As he did in the first iteration of this lawsuit, Ray argues that approval of the transfers by the bankruptcy trustee overseeing the General Partners' bankruptcy cases moots this issue, and, once again, the Court disagrees because the bankruptcy trustee has no authority to make decisions regarding the management of the Funds.

role. Because Ray has expressly disavowed this responsibility and because the Limited Partners have not exercised their authority to appoint someone willing to accept it, the Court will act to appoint someone who is willing.

{67} The relevant North Carolina and Delaware statutes regarding a court-ordered winding up of a limited partnership appear to first require an application by a partner or some other authorized representative. N.C.G.S. § 59-803 (2006); Del. Code Ann. tit. 6, § 17-803(a) (2006). In this case, however, the Court relies, not on the statutory authority delineated in the North Carolina and Delaware codes, but rather on its inherent equitable power to appoint a receiver in a proper case. *See Sinclair v. Moore Cent. R.R. Co.*, 228 N.C. 389, 395, 45 S.E.2d 555, 560 (1947) ("The power of the court to appoint a receiver in proper cases and upon a proper showing is not limited by prevailing statutory provisions. . . . It is one of the inherent powers of a court of equity."); *see also Lowder v. All Star Mills, Inc.*, 301 N.C. 561, 576, 273 S.E.2d 247, 256 (1981) (holding that "a Court of Equity has the inherent power to appoint a receiver, notwithstanding specific statutory authorization.").

{68} Accordingly, the Court will appoint a receiver to oversee the winding up of the Funds' affairs within this State. The Court appointed receiver will have the powers set forth in N.C.G.S. § 1-507.2 (2006) with respect to receivers appointed for insolvent corporations. His powers will be plenary with respect to Fund I, a North Carolina entity. Because Fund II is a Delaware limited partnership, however, the receiver's authority as to Fund II will be limited to those assets physically within this State, including, but not limited to, the lawsuits filed and pending in this Court and in the Bankruptcy Court for the Western District of North Carolina.[5] *Cf.* N.C.G.S. § 1-502(4) (2006)

---

[5] The case pending in the Bankruptcy Court is styled *Piedmont Ventures Partners, L.P., et. al. v. Stacy Anderson, et. al.* (Adversary Proceeding 06-03251).

16

(providing that a receiver may be appointed to take control and dispose of property within this state of foreign corporations).

{69}   With respect to the Funds' litigation claims, the receiver will determine whether the claims can and should be prosecuted.  In that regard, the receiver may consider the views of the Limited Partners, including Ray.  Any decision that disposes of the claims short of trial, however, whether by dismissal or compromise settlement, shall be approved by the Court.[6]

{70}   G. Martin Hunter, Esq., of the Mecklenburg County Bar has indicated a willingness to consider serving as receiver for the Funds.  Mr. Hunter serves presently as the receiver in a case pending before this Court, *Greyson Ridge Dev., LLC v. Mountaineer Land Group, LLC*, 05 CVS 6615 (Mecklenburg County Superior Court).

{71}   The Court directs the parties to consult with Mr. Hunter regarding his suitability to serve.  If the parties find him acceptable, and if Mr. Hunter confirms his willingness to serve, the parties shall so advise the Court within twenty (20) days of the entry of this Order.

{72}   Alternatively, if the parties wish the Court to consider other nominees to serve as the court-appointed receiver, and those individuals are willing to serve, they shall submit their recommendations to the Court within the same 20-day period.  Thereafter, the Court will determine whether a further hearing is necessary with respect to the appointment of a receiver.

{73}   The court-appointed receiver shall not be required to post a bond.

## CONCLUSION

{74}   The Court **DENIES** the Defendants' Motion to Dismiss the Amended Complaint.  The Court will instead appoint a receiver for the Funds as set forth in this Order.

This the 5th day of March 2007.

---

[6] The receiver shall also comply with any requirements the bankruptcy court may impose for dismissal or approval of a compromise settlement of the claims pending in that forum.